December 18, 1978

## 78-67  MEMORANDUM OPINION FOR THE SPECIAL ASSISTANT TO THE ATTORNEY GENERAL

### Immigration and Nationality Act (8 U.S.C. § 1182(d)(5))—Cuban Parole Program

This responds to your request that we address the following questions:
1. Can a parole visa be revoked once the parolee has entered the United States? If so, under what conditions?[1]
2. Does the law allow any Cuban who holds dual U.S.-Cuban citizenship to immigrate to the United States with his or her entire family?

### I. Parole Revocation

Parole of aliens into the United States is governed by § 212(d)(5) of the Immigration and Nationality Act (the Act), 8 U.S.C. § 1182(d)(5). That provision reads as follows:

> The Attorney General may in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

Thus, when the Attorney General determines that the purposes of parole have been served, parole is revoked and the parolee faces exclusion proceedings as described in §§ 235 and 236 of the Act, 8 U.S.C. §§ 1225, 1226, as would any alien initially applying for admission into the United States. Section 212.5(b) of

---

[1] An alien who is paroled into the United States does not receive a visa. A visa is a document issued by a consular officer to immigrants and nonimmigrants coming to the United States. Moreover, a parolee does not "enter" the United States in a legal sense. *See* 8 U.S.C. § 1182(d)(5).

Title 8 of the Code of Federal Regulations provides that parole shall be terminated and pre-parole status restored upon an alien's receiving written notice of the following: expiration of his parole period; that the purpose for which the parole was authorized has been accomplished; or when the District Director of the Immigration and Naturalization Service (INS) in charge of the area where the alien is located determines that neither emergency reasons nor public interest warrants his continued presence in the United States. In parole revocation proceedings, parolees are not entitled to the full panoply of procedural rights accorded aliens in deportation proceedings.[2] *See, Leng May Ma* v. *Barber,* 357 U.S. 185 (1958); *Rogers* v. *Quan,* 357 U.S. 193 (1958); *Siu Fung Luk* v. *Rosenberg,* 409 F. (2d) 555 (9th Cir. 1969), cert. dismissed, 396 U.S. 801 (1969). Moreover, as stated above, the discretion to terminate parole resides in the Attorney General or his delegates and none of the statutory grounds for deportation under § 241 of the Act, 8 U.S.C. § 1251, need be alleged.

However, in one case, *United States* v. *Murff,* 260 F. (2d) 610 (2d Cir. 1958), the court held that the parole of certain refugees may be revoked only if they are accorded the same rights as those given aliens in deportation cases. The court after acknowledging that parolees may, in the normal case, have their parole summarily revoked, held that under the particular facts involved additional procedural protections were required before parole could be revoked. It noted that the circumstances under which the Hungarian refugees there involved were paroled into the United States made the case *sui generis.* In concluding that the refugees were "invited" to this country, the court stressed that the President had directed the Attorney General to exercise his § 212(d)(5) parole power to admit a certain number of Hungarian refugees in excess of the visas authorized under the Refugee Relief Act. *Id.,* at 613. It also stressed the fact that Congress had passed legislation endorsing the President's action.

The *Murff* case seems to stand alone; other courts have consistently distinguished *Murff. See, Ahrens* v. *Rojas,* 292 F. (2d) 406 (5th Cir. 1961) (case involving Cuban refugees); *Siu Fung Luk* v. *Rosenberg,* 409 F. (2d) 555 (9th Cir. 1969), cert. dismissed, 396 U.S. 801 (1969). *But see* the dictum of the Board of Immigration Appeals in *Matter of O,* Interim Decision 2614 (1977), suggesting that *Murff* might have some applicability to parole revocations of certain aliens paroled into the United States as part of the Vietnam evacuation. However, it would seem that even if the *Murff* rationale were invoked, a court would not necessarily require the full range of procedural protections required in deportation proceedings. *See* the comments of the Board of Immigration Appeals in *Matter of O, supra.*

Once parole is revoked, the alien becomes subject to an exclusion proceeding, in which he may seek asylum in the United States as a political refugee. Previously the law was unsettled. *See, Sannon* v. *United States,* 427 F. Supp. 1270 (S. D. Fla. 1977) (asylum claims must be heard in exclusion proceed-

---

[2] The procedural rights due aliens subject to deportation proceedings are set forth in § 242 of the Act, 8 U.S.C. § 1252.

ings), and *Pierre* v. *United States*, 547 F. (2d) 1281 (5th Cir. 1977) (asylum claims are not required to be considered in exclusion proceedings).[3] However, the issue has been mooted since the Solicitor General represented to the Supreme Court that the Government would grant a hearing on asylum applications in exclusion proceedings. *See* Memorandum Suggesting Mootness, in *Pierre* v. *United States*, O. T. 1977, No. 77-53. The Court granted *certiorari*, vacated the judgment, and remanded the case to the Court of Appeals to determine the mootness question. *Pierre* v. *United States*, 434 U.S. 962 (1977). In the meantime, INS has proposed a regulation to grant hearings on asylum claims in exclusion proceedings. 43 F.R. 48629. Thus, asylum claims must now be heard in an exclusion proceeding.

## II. Dual United States and Cuban Citizenship

A U.S. citizen possessing dual citizenship may leave and reenter the United States without regard to any restrictions applicable to aliens. Cuban residents related to U.S. citizens and who are themselves U.S. citizens at birth by virtue of section 301(a) of the Act, 8 U.S.C. § 1401(a), may also enter the United States without regard to such restrictions.

Alien "immediate relatives" of U.S. citizens may be admitted to this country without regard to quota limitations pursuant to § 201(a) of the Act, 8 U.S.C. § 1151(a). That term includes a U.S. citizen's children, spouse, and where the U.S. citizen is at least 21 years old, his parents. § 201(b), 8 U.S.C. § 1151(b). Also, it is permissible first to parole these persons into the United States and permit them thereafter to seek adjustment of their status to that of persons admitted for permanent residence. § 245, 8 U.S.C. § 1255. Other members of the U.S. citizen's family may be paroled into the United States although they may not enjoy the status of immediate relatives of a U.S. citizen.

JOHN M. HARMON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[3]The issue in these cases centered on the interpretation of the United Nations Convention and Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, TIAS 6557, to which the United States became a signatory on November 1, 1968.

Article 1 of that document incorporates by reference the 1951 Geneva Convention Relating to the Status of Refugees. Article 1, as modified by the Protocol, defines a refugee as one who—

. . . owing to well-founded fear of being prosecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country, or who. not having a nationality and being outside the country of his former habitual residence, is unable or, owing to such fear, is unwilling to return to it.

Article 33 of the Protocol provides in pertinent part that "[n]o Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."